# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2278 and 2014AP2279 |
| COMPLETE TITLE: | In re: Acquisition of Property of Ricardo M. Garza and Julie L. Garza: |

Ricardo M. Garza and Julie L. Garza,
     Plaintiffs-Appellants,
v.

American Transmission Company LLC and ATC Management, Inc.,
     Defendants-Respondents-Petitioners.
_____
American Transmission Company LLC and ATC Management, Inc.,
     Plaintiffs-Respondents-Petitioners,

v.

Ricardo Garza and Julie Garza,
     Defendants-Appellants.

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at: 366 Wis. 2d 330, 873 N.W.2d 99

| | |
|---|---|
| OPINION FILED: | April 13, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 1, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Waupaca |
| JUDGE: | Mark J. McGinnis |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

     For the defendants-respondents-petitioners, there were briefs by *Bryan J. Cahill, Katherine Stadler* and *Godfrey & Kahn, S. C.*, Madison, and oral argument by Bryan J. Cahill.

For the plaintiff-appellant, there was a brief by *Frank J. Jablonski and Progressive Law Group, LLC,* Madison, and oral argument by Frank Jablonski.

An amicus curiae brief was filed by *Cori Moore Lamont*, Madison for *The Wisconsin Realtors® Association*.

An amicus curiae brief was filed by *Bradley D. Jackson*, *James E. Goldschmidt* and *Quarles & Brady, LLP*, Madison for *Wisconsin Utilities Association*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos.   2014AP2278 & 2014AP2279
(L.C. Nos.  2011CV467 & 2011CV478)

STATE OF WISCONSIN          :          IN SUPREME COURT

In re:  Acquisition of Property of Ricardo M.
Garza and Julie L. Garza:

Ricardo M. Garza and Julie L. Garza,
          Plaintiffs-Appellants,

          v.

American Transmission Company LLC and ATC
Management, Inc.,
          Defendants-Respondents-Petitioners.

American Transmission Company LLC and ATC
Management, Inc.,
          Plaintiffs-Respondents-Petitioners,

          v.

Ricardo Garza and Julie Garza,
          Defendants-Appellants.

**FILED**

**Apr 13, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Reversed.*

¶1   MICHAEL J. GABLEMAN, J.   This is a review of an unpublished per curiam decision of the court of appeals

reversing the Waupaca County circuit court's[1] grant of summary judgment in favor of American Transmission Company LLC and ATC Management, Inc. (collectively referred to as "ATC"). Garza v. Am. Transmission Co., Nos. 2014AP2278 & 2014AP2279, unpublished slip op. (Wis. Ct. App. Nov. 19, 2015) (per curiam).

¶2 This case requires us to decide whether ATC has the right, either under a 1969 deed of easement (hereinafter referred to as the "1969 easement") or by means of a prescriptive easement under Wis. Stat. § 893.28(2) (2013-14),[2] to enter the property of Ricardo M. and Julie L. Garza ("the Garzas") and trim some, and remove other, trees which are threatening or endangering the operation of one of ATC's electric transmission lines. We hold that, under the 1969 deed of easement, ATC has the right to enter the Garzas' property to both trim and remove the trees that threaten or endanger the operation of the relevant transmission line.[3] This is so because, contrary to what the Garzas argue, the 1969 easement is still in effect, thereby allowing ATC to enter their property. The 1969 easement's language "comprising wood pole structures" is language of description, not circumscription, and as such, it

---

[1] The Honorable Mark J. McGinnis presiding.

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[3] Because we resolve the case under the 1969 deed of easement, we do not address whether ATC has prescriptive rights under Wis. Stat. § 893.28(2) to trim and remove trees on the Garzas' property.

does not limit the transmission line to being constructed on wood poles, thereby terminating the 1969 easement. Rather, the 1969 easement grants to the dominant estate holder (here ATC) the right to make the change from wood poles to steel poles. Therefore, the decision of the court of appeals is reversed.

I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶3   Jerome and Betty Hertig ("the Hertigs") granted an easement to the Wisconsin Public Service Corporation ("WPSC") by deed dated June 28, 1969.  The 1969 easement was recorded on July 8, 1969.

¶4   The 1969 easement is titled "Transmission Line Easement."  It grants WPSC

> the perpetual right, privilege and easement to erect, maintain and operate an electric transmission line, comprising <u>wood pole structures</u>[4] conductors and other wires, counterpoises, guy wires, braces and other usual appendages and appurtenances of such kind as said Grantee, its successors and assigns, may from time to time determine, for transmitting electric current over and across [the Hertigs' property.]

The 1969 easement continues with a property description of the Hertigs' property and a description of the easement route.

¶5   The 1969 easement also provides:

> Together with the right from time to time to enter upon said premises for the purpose of erecting said line, and changing, repairing, patrol[l]ing, replacing and removing the same, and the right from time to time

---

[4] The 1969 easement was a form easement used by WPSC at the time the Hertigs and WPSC entered the 1969 easement.  The underlined language represents a blank space on the easement form that the parties completed.

3

to clear all brush and trees within <u>40</u> feet <u>of each side</u> of the center line of such transmission line and the right from time to time to cut down, trim or remove such trees on said premises beyond such <u>40</u> feet as in the judgment of Grantee, its successors and assigns, may interfere with or endanger said line, and to do any and all other acts necessary in the proper erection, maintenance, safeguarding, and operation of said line.

¶6  Pursuant to the 1969 easement, WPSC constructed a 69 kV[5] transmission line on wood pole structures on the route described therein.[6]  Following the 1969 easement, in 1977, the Hertigs subdivided their property to create Woodland Park Estates subdivision.

¶7  In 1995, to meet the community's increased electrical needs, WPSC upgraded the transmission line from a 69 kV line to a double-circuit 69 kV/138 kV[7] line to allow the transmission line to carry more electricity.  WPSC also replaced the wood poles supporting the transmission line with steel poles.

¶8  WPSC assigned the easement to ATC in 2001, and the assignment was recorded the same day.

¶9  On September 30, 2004, the Garzas purchased Lot 1 of Woodland Park Estates.  There is no dispute that, at the time of purchase, the Garzas were aware of the transmission line.  They

---

[5] kV stands for kilovolts and serves as a way to measure electricity.

[6] A visual depiction of the transmission line's route is included in the Appendix.

[7] This double-circuit line is composed of two transmission lines.

4

saw the transmission line and received a copy of the 1969 easement with the paperwork when they purchased their home. In addition, the 1969 easement was noted on their title insurance policy.

¶10 Because Lot 1 is in the southeastern corner of Woodland Park Estates, the transmission line is not on the Garzas' property. However, the Garzas' property is still impacted by the 1969 easement (1) because it is located within the 80-foot strip of land wherein WPSC reserved the right to clear all trees and brush and (2) because WPSC reserved the right to trim and remove trees that "interfere with or endanger" the transmission line even if the trees are located outside the 80-foot strip of land.

¶11 In late 2010, ATC contacted the Garzas to notify them that it needed to enter the Garzas' property to perform maintenance for the operation of the transmission line, which in this case required trimming and removing trees both on and bordering the Garzas' property. The trimming and removal was necessary because the trees threatened or endangered the operation of the transmission line. As ATC explained in its brief, trimming and removing the trees was necessary "to ensure

the safe and reliable operation of the transmission line."[8]  It would also ensure the safety of anyone who may need to perform work on a transmission line.

¶12  While ATC was able to perform some of the necessary work in August 2011, the Garzas prevented ATC from completing its maintenance project, and this suit followed.

¶13  The Garzas filed an inverse condemnation action on September 6, 2011, in the Waupaca County circuit court (L.C. No. 2011CV467), and on September 8, 2011, ATC filed a declaratory judgment action (L.C. No. 2011CV478) in which it sought an order from the court declaring that it had a right, under the 1969 easement and/or pursuant to the rights of prescriptive easement under Wis. Stat. § 893.28(2), to enter the Garzas' property and trim and remove the trees threatening or endangering the operation of the transmission line.

¶14  On October 3, 2011, the Garzas filed counterclaims in which they sought (1) a declaratory judgment that ATC did not have the right to enter their property to trim and remove trees

---

[8] To make its point that maintaining trees and other vegetation surrounding a transmission line is important, ATC points to an event in 2003 in Ohio where a tree damaged a transmission line and caused roughly 50 million people to lose power for two days. See Brian S. Tomasovic, A High-Voltage Conflict on Blackacre:  Reorienting Utility Easement Rights for Electric Reliability, 36 Colum. J. Envtl. L. 1, 6-7 (2011).  In fact, "[t]he courts have recognized that properly and safely maintaining power lines involves keeping the wires clear of interference, in the context of an easement acquired by condemnation."  Gallagher v. Grant-Lafayette Elec. Co-op, 2001 WI App 276, ¶18, 249 Wis. 2d 115, 637 N.W.2d 80.

and (2) alleged trespass, intentional property damage, and inverse condemnation.

¶15 After the cases were consolidated, ATC moved for summary judgment, and the Garzas' moved for a declaratory judgment. The circuit court, in addressing both motions, found, inter alia, that, under the 1969 easement, "ATC is allowed to remove the trees at issue and they do not trespass on the Garzas' property in doing so." The circuit court stated, "The unambiguous language of the easement allows for changing, repairing, and/or replacing the transmission line over the course of time in perpetuity. The language of the easement demonstrates that the parties obviously wanted the easement to survive changes in both power needs and technology." Therefore, because Wisconsin law allows the dominant estate holder to do what is reasonably necessary to continue enjoying the right to use[9] granted under a deed of easement, the circuit court found that the 1969 easement was not invalidated when the wood poles were replaced with steel poles. The circuit court found it important that WPSC "stayed within the general bounds of the easement and only furthered the use of the enjoyment when the power demands of the area necessitated changing the facility." Consequently, the circuit court granted ATC's motion for summary judgment and denied the Garzas' motion for a declaratory judgment.

---

[9] The right to use is a term of art that includes, among other things, the right to reasonable implementation of advances in technology. This term will be described in greater detail.

7

¶16 The circuit court also found that summary judgment was improper for determining whether ATC had any prescriptive easement rights under Wis. Stat. § 893.28(2) because "there are questions of fact as to the scope of any prescriptive easement" that precluded summary judgment. The Garzas appealed.

¶17 The court of appeals reversed the circuit court. Garza, unpublished slip op., ¶1. It interpreted the 1969 easement as limiting the transmission line to being constructed on a wood pole structure. Id., ¶15. Thus, the court of appeals "reasoned," the transmission line upon which the 1969 easement was founded no longer exists and therefore ATC has no rights to enter the Garzas' property. Id., ¶16. The court of appeals also stated that ATC failed to show that it has prescriptive easement rights to trim and remove trees on the Garzas' property. Id., ¶22. Consequently, the court of appeals reversed the circuit court's grant of summary judgment in favor of ATC and remanded the case for further proceedings. Id., ¶23.

¶18 ATC petitioned this court for review, which this court granted on April 6, 2016. We now address whether ATC has the right to trim and remove the trees threatening or endangering the operation of the transmission line under the 1969 easement.

## II. STANDARD OF REVIEW

¶19 This case requires us to review a decision of summary judgment and requires us to review an interpretation of a deed of easement. This court reviews a decision of summary judgment de novo. Borek Cranberry Marsh, Inc. v. Jackson County, 2010 WI 95, ¶11, 328 Wis. 2d 613, 785 N.W.2d 615. "The proper

8

construction of an easement is a question of law that we review de novo."  Id., ¶12.

### III.  DISCUSSION

### A.  Summary Judgment

¶20 Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Wis. Stat. § 802.08(2).

¶21 In making this determination, this court applies a two-step test.  Green Springs Farms v. Kersten, 136 Wis. 2d 304, 314-15, 401 N.W.2d 816 (1987).  Under the first step, this court asks if the plaintiff stated a claim for relief.  Id. at 315. Under the second step, this court applies the summary judgment statute and asks if any factual issues exist that preclude a grant of summary judgment.  Id.

¶22 Here, we must interpret the 1969 easement to determine whether ATC's motion for summary judgment should be granted.

### B.  Relevant Principles of Easement Law

¶23 An easement grants a right to use another's land. Konneker v. Romano, 2010 WI 65, ¶25, 326 Wis. 2d 268, 785 N.W.2d 432 (quoting Hunter v. McDonald, 78 Wis. 2d 338, 343, 254 N.W.2d 282 (1977)).  It also creates two estates:  the dominant estate enjoys the ability to use the land in the way described in the easement, while the servient estate permits that use. Id.  The dominant estate holder's "use of the easement must be

9

in accordance with and confined to the terms and purposes of the grant." Id. (quoting Stoesser v. Shore Drive P'ship, 172 Wis. 2d 660, 668, 494 N.W.2d 204 (1993)). Any use not in accordance with the specific right to use granted in the easement is outside the easement's scope and thus prohibited. See Grygiel v. Monches Fish & Game Club, Inc., 2010 WI 93, ¶34, 328 Wis. 2d 436, 787 N.W.2d 6.

¶24 For a written easement, "[t]he primary source of the parties' intent is what is written within the four corners of the deed." Konneker, 326 Wis. 2d 268, ¶26. Thus, we look to the deed of easement[10]——here the 1969 easement——to determine what right to use the dominant estate holder has.

¶25 If the language contained in the deed of easement is unambiguous, we look no further than the deed of easement itself. Id. However, if the language is ambiguous, we resort to extrinsic evidence to help us determine the parties' intentions. Id. In this case, we conclude that the 1969 easement is unambiguous, and we need look no further than the language contained in the 1969 easement.

C. Interpretation of the 1969 Easement

¶26 The Garzas argue that ATC does not have the right to enter their property to trim or remove the trees threatening or endangering the operation of the transmission line because the change from wood poles to steel poles invalidated the easement.

---

[10] A deed of easement is a document that contains the terms of a written easement.

10

They base their argument on language within the 1969 easement referring to "wood pole structures." The Garzas claim the entire 1969 easement is premised on the right to construct a transmission line on wood poles. Accordingly, without a transmission line constructed on wood poles, the 1969 easement and the rights granted in connection with that transmission line cease to exist. Thus, the Garzas argue, the 1969 easement is invalid and ATC no longer has the right to enter the Garzas' property.

¶27 ATC, on the other hand, argues that to interpret the language "comprising wood pole structures" so as to proscribe other materials from being used in the structure is to read that phrase out of context and preclude evaluation of the 1969 easement as a whole. ATC further argues that replacing the wood poles with steel poles is permitted under the implied term contained in every easement that the dominant estate holder may do what is reasonably necessary to continue enjoying the right to use granted under a deed of easement. Thus, ATC argues the change from wood poles to steel poles did not invalidate the 1969 easement and, with the 1969 easement still in place, ATC has the right to enter the Garzas' property to trim and remove the trees threatening or endangering the operation of the transmission line.

¶28 We agree with ATC.

1. An Easement Allows for Advances in Technology and Reasonable Implementation of Such Advances Does Nothing to Extinguish the Rights Granted Therein

11

¶29 We have long recognized that, implied in every easement, unless otherwise stated, is the right of the dominant estate to do what is reasonably necessary to enjoy the easement. Scheeler v. Dewerd, 256 Wis. 428, 41 N.W.2d 635 (1950) (allowing the parties to upgrade well facilities from a hand pump to modern plumbing equipment); see also McDonnell v. Sheets, 15 N.W.2d 252, 255 (Iowa 1944) (allowing a dominant estate holder to use an easement for ingress and egress as a driveway for automobiles when the easement stated "team and wagon"). The Restatement (Third) of Property describes the "right to use" as follows:

> Except as limited by the terms of the servitude determined under § 4.1, the holder of an easement or profit as defined in § 1.2 is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude. The manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude. Unless authorized by the terms of the servitude, the holder is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment.

Restatement (Third) of Property: Servitudes § 4.10 (Am. Law Inst. 2000) (emphasis added).

¶30 We conclude that the change from wood to steel poles was a reasonable change made in order to take advantage of developments in technology. The authorization from the Public Service Commission of Wisconsin ("PSCW") noted that the changes made to the transmission line in 1995 would be an upgrade that would "allow electric distribution system improvements to occur"

12

and noted that the old lines were incapable of providing the electricity needed in the area.

¶31 Although the holder of a dominant estate may take advantage of advances in technology to make more full or convenient use of the right(s) granted within the easement, the dominant estate's ability to take advantage of advances in technology is not unlimited. The dominant estate may not "cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment." Restatement (Third) of Property: Servitudes § 4.10. Thus, any changes in the dominant estate's use may not place an undue burden on the servient estate. See Hunter, 78 Wis. 2d at 344 ("The dominant owner's . . . interest is not an estate in land, but rather a right to use the land of another for a special purpose not inconsistent with the general property in the owner."). A change in use that places such a burden on the servient estate is outside the scope of the dominant estate's right to use. See Grygiel, 328 Wis. 2d 436, ¶34.

¶32 The change from wood to steel placed no undue burden on the servient estate. It is undisputed that steel poles can support more weight than wood poles and allow for longer spans between poles. This means fewer poles are needed to support the upgraded transmission line, and the Garzas have failed to show how the placement of fewer supporting structures—regardless of what they are constructed of—along the route of the easement places more of a burden on the servient estate because there are fewer of them. See id., ¶23 (quoting Millen v. Thomas, 201

13

Wis. 2d 675, 683-85, 550 N.W.2d 134 (Ct. App. 1996)). The steel poles were also constructed within the boundary established by the 1969 easement, which means the steel poles do not occupy any additional space. Accordingly, no showing has been made that an undue burden was placed on the servient estate.

2. The Significance of the Phrase "Comprising Wood Pole Structures"

¶33 Nevertheless, the Garzas argue that the language of the 1969 easement expressly forecloses ATC from installing steel poles because the 1969 easement refers to the transmission line as "comprising wood pole structures." However, we conclude that this language places no limitation on ATC's right to take advantage of reasonable advances in technology because "comprising wood pole structures" is language of description, not circumscription.

¶34 At the beginning of the easement, the context suggests the parties intention that the 1969 easement be for the purpose of constructing and operating a transmission line: Notably, the 1969 easement is titled "Transmission Line Easement" (and not, for example, "Easement for the Construction of Wood Pole Structures"), and the first right granted in the 1969 easement is the right "to erect, maintain and operate an electric transmission line." The language within the easement is reflective of the parties' intent that the 1969 easement be for the construction and operation of a transmission line. There is no indication that the parties intended to place any sort of limitation on either the construction material or on the

14

dominant estate holder's right "to erect, maintain and operate an electric transmission line."

¶35  The 1969 easement goes on to grant to the "Grantee, its successors and assigns" the right to, "from time to time determine," the type of conductors, wires, etc. to be used "for transmitting electric current over and across" the property. Furthermore, the easement grants the right to enter the property "for the purpose of erecting said line, and changing, repairing, patrol[l]ing, replacing and removing the same," and the right "to do any and all other acts necessary in the proper erection, maintenance, safeguarding, and operation of said line."

¶36  Read as a whole,[11] this language reflects an intention on the part of the parties to the 1969 easement to grant the dominant estate holder the ability to construct and operate a transmission line.  Additional terms touch upon such concepts as "changing" and "replacing" that indicate that the parties intended the dominant estate holder to have the ability to change its use in a way that allows for the continued operation of the transmission line.  Cf. Wis. Pub. Serv. Corp. v. Andrews, 2009 WI App 30, ¶12, 316 Wis. 2d 734, 766 N.W.2d 232 (interpreting "reconstruct" to allow the dominant estate holder to upgrade a transmission line from 161 kV to 345 kV).

¶37  In addition, the 1969 easement allows the dominant estate holder discretion to determine how the transmission line

---

[11] See Borek Cranberry Marsh, Inc. v. Jackson County, 2010 WI 95, ¶¶31-32, 328 Wis. 2d 613, 785 N.W.2d 615.

15

should be constructed. The 1969 easement starts with the following grant of rights:

> [T]he perpetual right, privilege and easement to erect, maintain and operate an electric transmission line, comprising <u>wood pole structures</u> conductors and other wires, counterpoises, guy wires, braces and other usual appendages and appurtenances of such kind as said Grantee, its successors and assigns, may from time to time determine, for transmitting electric current over and across [the property].

But, it does not end there. The parties also included a right in the 1969 easement that grants discretion to the dominant estate to determine what is "necessary in the proper erection, maintenance, safeguarding, and operation of said line." Perhaps most tellingly, what the parties did not include was a provision requiring that the transmission line be limited to being placed on a wood pole structure. See <u>Atkinson v. Mentzel</u>, 211 Wis. 2d 628, 638-39, 566 N.W.2d 158 (Ct. App. 1997) (limiting the uses granted in an easement to anything other than retail sales because the easement granted "access for all uses of said property other than retail sales").

¶38 It is true that the right "to erect, maintain and operate an electric transmission line" is followed by the language "comprising wood pole structures." However, we must read "comprising wood pole structures" within the context described above, which indicates that the parties did not intend to limit the transmission line to a wood pole structure. See <u>Borek</u>, 328 Wis. 2d 613, ¶¶31-32 (using the easement's title——"Easement for Flowage Rights"——and other language contained in

16

the deed of easement to interpret the meaning of "heirs and assigns"). We will not take "comprising wood pole structures" to place a limit on the dominant estate holder's right to use the servient estate for a transmission line when the entirety of the 1969 easement indicates there is no such limit: the title of the 1969 easement ("Transmission Line Easement"), the language of the first right granted to the dominant estate holder, and the additional rights granted to the dominant estate to, inter alia, change and replace the transmission line and to take actions considered necessary for the operation of the transmission line indicate the dominant estate holder has flexibility in its right to use the servient estate for the transmission line.

3. The Present Use Is Consistent with the Purpose of the 1969 Easement

¶39 "The use of the easement must be in accordance with and confined to the terms and purposes of the grant." Hunter, 78 Wis. 2d at 343; see also Grygiel, 328 Wis. 2d 436, ¶36 (interpreting a deed of easement for ingress and egress consistently with the purpose for which the easement was granted——access to the defendant's property). In this case, the purpose of the 1969 easement is to transmit electricity. Therefore, elevating the phrase "comprising wood pole structures" to the status of a limitation on the dominant estate's ability to operate the transmission line would be inconsistent with the underlying purpose of the 1969 easement, namely to transmit electricity. See AKG Real Estate, LLC v.

17

Kosterman, 2006 WI 106, ¶¶23-24, 296 Wis. 2d 1, 717 N.W.2d 835 (refusing to allow the width of an easement for ingress and egress to determine that the easement's purpose was for building a public road because the easement width (66 feet) was the exact width needed to build a public road).

¶40 Interpreting the 1969 easement to permit the use of other materials such as steel is consistent with the 1969 easement's purpose to transmit electricity because, as the PSCW recognized when it approved the application to upgrade the transmission line, transmission of the necessary voltage of electric current using the original transmission line on the original structure was no longer feasible.

### 4. The PSCW Authorization

¶41 As an alternative argument, the Garzas argue that Point 33 of the PSCW's authorization to upgrade the transmission line terminated the 1969 easement. Point 33 states:

> That WEPCO and WPS shall remove the wires and structures of all existing 34 kV, 46 kV, 69 kV, and 115 kV lines retired or taken out of operation as part of this project, and properly backfill all holes where structures are removed. Easements for rights-of-way of removed lines shall be terminated, forfeiting all rights to the landowners.

Like the circuit court, we conclude this argument is unavailing. As the circuit court said,

> it is clear that paragraph 33 only terminates the easements where the entire installation was removed, not where a new facility was installed replacing the old. It would be nonsensical to find that the PSCW was ordering easements to be terminated where it was simultaneously ordering new facilities to be constructed.

18

When read in the context of the rest of the PSCW's 1994 authorization, it is therefore clear that the PSCW did not intend to terminate rights-of-way for transmission lines being replaced but, rather, intended only to terminate rights-of-way for transmission lines that were being removed and not replaced. The rights of ATC under the terms of the 1969 easement are unaffected by this term.

### 5. Visual Blight

¶42 The Garzas also claim that the transmission line causes visual blight; however, we decline to address this argument because it was not properly developed and argued.[12] See State v. Gulrud, 140 Wis. 2d 721, 730, 412 N.W.2d 139 (Ct. App. 1987) (declining to address an argument because the defendant did not "explain his contention or develop his argument").

### IV. CONCLUSION

¶43 We hold that, under the 1969 deed of easement, ATC has the right to enter the Garzas' property to both trim and remove the trees that threaten or endanger the operation of the relevant transmission line. The 1969 easement's language "comprising wood pole structures" is language of description, not circumscription, and as such, it does not limit the transmission line to being constructed on wood poles. Rather, the 1969 easement grants to the dominant estate (here ATC) the right to make the change from wood poles to steel poles. A

---

[12] The Garzas raised visual blight in a few footnotes in their brief.

19

dominant estate has the right to do what is reasonably necessary to enjoy the right to use granted in a deed of easement, provided no undue burden is placed on the servient estate.

*By the Court.*—The decision of the court of appeals is reversed.

## APPENDIX

