# COURT OF APPEALS
# DECISION
# DATED AND FILED

# August 29, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| Appeal Nos. | 2023AP1327 | Cir. Ct. Nos. 2021CV148 |
| | 2023AP1328 | 2022CV46 |
| | 2023AP1329 | 2022CV52 |
| | 2023AP1330 | 2022CV53 |
| | 2023AP1381 | 2021CV138 |
| | 2023AP1429 | 2021CV130 |

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

No. 2023AP1327

WILLIAM C. AND NANCY K. HANSON REVOCABLE TRUST,

    PLAINTIFF-APPELLANT,

  V.

AMERICAN TRANSMISSION COMPANY LLC, ATC MANAGEMENT INC., AND DAIRYLAND POWER COOPERATIVE,

    DEFENDANTS-RESPONDENTS.

---

No. 2023AP1328

WILLIAM E. KEENEY, CHERYL M. KEENEY, WILLIAM E. KEENEY, AND CHERYL M. KEENEY IRREVOCABLE TRUST,

 PLAINTIFFS-APPELLANTS,

 V.

AMERICAN TRANSMISSION COMPANY LLC, ATC MANAGEMENT INC., AND DAIRYLAND POWER COOPERATIVE,

 DEFENDANTS-RESPONDENTS.

No. 2023AP1329

ROSS D. CAYGILL AND REED A. CAYGILL,

 PLAINTIFFS-APPELLANTS,

 V.

AMERICAN TRANSMISSION COMPANY LLC, ATC MANAGEMENT INC., AND DAIRYLAND POWER COOPERATIVE,

 DEFENDANTS-RESPONDENTS.

No. 2023AP1330

JAMES W. DAENTL AND PEGGY J. DAENTL REVOCABLE TRUST OF 2014,

 PLAINTIFF-APPELLANT,

 V.

AMERICAN TRANSMISSION COMPANY LLC, ATC MANAGEMENT INC., AND DAIRYLAND POWER COOPERATIVE,

 DEFENDANTS-RESPONDENTS.

NO. 2023AP1381

DEER FOOT ROCK LLC,

PLAINTIFF-APPELLANT,

V.

AMERICAN TRANSMISSION COMPANY LLC, ATC
MANAGEMENT INC., AND DAIRYLAND POWER COOPERATIVE,

DEFENDANTS-RESPONDENTS.

NO. 2023AP1429

MARK T. HODGSON,

PLAINTIFF,

BONNIE J. HODGSON,

PLAINTIFF-APPELLANT,

V.

AMERICAN TRANSMISSION COMPANY LLC, ATC
MANAGEMENT INC., AND DAIRYLAND POWER COOPERATIVE,

DEFENDANTS-RESPONDENTS.

APPEALS from orders of the circuit court for Iowa County: MATTHEW C. ALLEN, Judge. *Affirmed in part; reversed in part and cause remanded with directions.*

Before Blanchard, Graham, and Taylor, JJ.

¶1 GRAHAM, J. The owners of six properties in Iowa County (collectively "the landowners") appeal circuit court orders that granted summary judgment in favor of American Transmission Company LLC, ATC Management,

Inc., and Dairyland Power Cooperative (collectively "ATC"), and dismissed the landowners' WIS. STAT. § 32.06(5) (2021-22) right-to-take actions against ATC.[1]

¶2    The landowners initiated these actions to challenge ATC's right to take easements on their respective properties for the purpose of constructing a high-voltage electric transmission line.  The landowners claimed that ATC's jurisdictional offers were defective in two ways.  First, ATC offered just compensation in the form of annual payments, as required by WIS. STAT. § 32.09(6r)(a), yet ATC limited the duration of those payments to 40 years.  According to the landowners, the 40-year limit violates § 32.09(6r)(a).  Second, the landowners argued that the easements described in the jurisdictional offers violate WIS. STAT. § 182.017(7)(h) because they would allow ATC to remove "hazard trees" and tree parts on portions of the landowners' properties "beyond the boundaries of the easements" and, on the Hodgson property, to use existing field roads and lanes for ingress and egress over the Hodgson property to the transmission line right-of-way.  The landowners renew these arguments on appeal.

¶3    Based on the specific arguments presented in these appeals, we conclude that the landowners can, through these right-to-take actions, challenge the 40-year limit that ATC placed on the annual payments in the jurisdictional offers.  We further conclude that the 40-year limit violates WIS. STAT. § 32.09(6r), but that the landowners are not entitled to a declaration that the jurisdictional offers are null and void as a remedy for this defect.  Turning to the landowners' arguments about WIS. STAT. § 182.017(7)(h), we conclude that the easements do

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

4

not violate § 182.017(7)(h) because the hazard-tree-rights and access-rights provisions do not grant ATC the right to use any lands "beyond the boundaries of the easement," as that phrase is used in § 182.017(7)(h).

¶4      Accordingly, we reverse in part the circuit court orders granting summary judgment in favor of ATC, and we remand for the circuit court to enter revised orders consistent with this opinion. On remand, we direct the court to declare that the 40-year limits on annual payments in the jurisdictional offers violate WIS. STAT. § 32.09(6r) and that the hazard-tree-rights provision and the Hodgson access provision do not violate WIS. STAT. § 182.017(7)(h).

## BACKGROUND

¶5      We begin by summarizing the undisputed facts, which are derived from the summary judgment materials. In the course of summarizing these facts, we also provide background about the statutory process that a public utility must follow to take private property for purposes of constructing and operating a high-voltage electrical transmission line.

¶6      The state and federal constitutions both prohibit the taking of private property "for public use without just compensation therefor." WIS. CONST. art. I, § 13; U.S. CONST. amend. V.[2] Under both provisions, a taking of private property for public use, sometimes referred to as an exercise of "condemnation" or

---

[2] Under the Wisconsin Constitution, government action constitutes a "taking" if it is "'an actual physical occupation' of private property," or if it is a restriction on private property "that deprives an owner 'of all, or substantially all, of the beneficial use of [the owner's] property.'" *E-L Enterprises, Inc. v. Milwaukee Metro. Sewerage Dist.*, 2010 WI 58, ¶22, 326 Wis. 2d 82, 785 N.W.2d 409 (citation omitted). The United States Constitution recognizes two similar categories of takings. *Id.* The latter category, often referred to as a "regulatory taking," *id.*, ¶23, is not at issue in these cases.

5

"eminent domain" authority, requires an award of just compensation. *Waller v. American Transmission Co., LLC*, 2013 WI 77, ¶55, 350 Wis. 2d 242, 833 N.W.2d 764 (citation omitted).

¶7    In Wisconsin, condemnation is governed by WIS. STAT. ch. 32. *Id.*, ¶56. WISCONSIN STAT. § 32.02 identifies the entities that have the power to take private property for public use, and it specifically grants that power to public utilities such as ATC. *Id.*, ¶59. WISCONSIN STAT. § 32.06, in turn, outlines the procedures that a public utility must use to take private property for public use, as well as the procedural avenues that a landowner may follow to challenge aspects of the taking.

¶8    Here, as part of a project to construct and operate a high-voltage electric transmission line known as the Cardinal Hickory Creek Transmission Line Project, ATC used its condemnation authority to take easements over the six properties at issue in these appeals, each of which is located in Iowa County. At all times pertinent to the issues in these appeals, the six properties were zoned or used for agricultural purposes.

¶9    Most takings under WIS. STAT. § 32.06 require a determination of the necessity of the taking. *Id.*, ¶60 (citing § 32.06(1)). As relevant here, a utility must "secure a certificate of public convenience and necessity … under WIS. STAT. § 196.491(3)." *Id.* (citing WIS. STAT. § 32.07; *Wisconsin Indus. Energy Grp. v. PSC*, 2012 WI 89, ¶¶26-38, 342 Wis. 2d 576, 819 N.W.2d 240 (describing the process of obtaining a certificate of public convenience and necessity from the state public service commission)); *see also* WIS. STAT. § 32.075(2) (under certain circumstances, after the commission has made its determination, "no further determination of necessity shall be required"). Here, ATC obtained a certificate of

public convenience and necessity for the project from the state public service commission.

¶10    Once a utility identifies the property it intends to take and obtains a certificate of public convenience and necessity, the utility must "attempt to negotiate personally" with the landowner for the purchase of the property "sought to be taken." *Id.*, ¶61 (citing WIS. STAT. § 32.06(2a)). If negotiations are successful such that they result in a voluntary sale, the utility may acquire the property by recording a conveyance and other documents. *Id.* ¶61 n.18 (citing § 32.06(2a)). If negotiations are unsuccessful, the utility may move forward with obtaining title to the property by sending the landowner a "jurisdictional offer to purchase," and, if the landowner rejects the jurisdictional offer, by following a statutory procedure that we describe below. *See* § 32.06(3); *see also* WIS. STAT. § 32.05(3) (specifying the required content of the jurisdictional offer). Here, ATC attempted to negotiate with each landowner to purchase each easement and, following unsuccessful negotiations, ATC served jurisdictional offers on each of the landowners.

¶11    A jurisdictional offer must include, among other things, a description of "the property and interest therein sought to be taken." WIS. STAT. § 32.05(3). For each of the jurisdictional offers at issue in these cases, ATC included a draft of the proposed easement document, which would grant ATC a "perpetual right and easement to construct, install, operate, maintain, repair, replace, rebuild, remove, relocate, inspect and patrol" a high-voltage electric transmission line and related equipment "upon, in, over and across property owned by the Landowner."

¶12    In each of the proposed easements, ATC delineated the length and width of a strip of land on a portion of the landowner's property, through which

7

the right-of-way for ATC's transmission line would pass. Each of the jurisdictional offers also included a map that specified the acreage of the strip of land, labeled on the map as the "ATC transmission line easement," and depicted its boundaries. ATC's documents sometimes refer to each of these strips of land as the "Perpetual Easement Strip," but for consistency and ease of reference, we refer to them as the "transmission line easement strips."

¶13 Each proposed easement identified the rights that ATC intended to acquire with regard to the transmission line easement strip. Among other things, ATC would have the right to enter the strip for the purpose of using the rights conveyed by the easement, and to trim, cut down, and remove trees, tree parts, and brush in, on, and over the strip.

¶14 Additionally, each proposed easement also identified the rights that ATC intended to acquire with regard to other portions of the landowner's property, outside the boundaries of the transmission line easement strip. All of the easements included a provision that we refer to as the "hazard-tree-rights provision," which would allow ATC to remove trees and tree parts outside the transmission line easement strip that "pose a threat to the safe and reliable operation" of the transmission line. We discuss the hazard-tree-rights provisions in more detail below.

¶15 The proposed easement on the Hodgson property also granted ATC a second, delineated strip of land, labeled "the permanent access easement," and certain rights beyond that strip of land that related to access. We provide

additional details about these Hodgson-specific access provisions as needed in the discussion below.[3]

¶16    In addition to describing the property and interests to be taken, a jurisdictional offer must also specify "the amount of compensation offered." *See* WIS. STAT. §§ 32.05(3), 32.06(3) (identifying substantive requirements for a jurisdictional offer). There is a special just compensation rule that applies when a public utility seeks to take "an easement … for the purpose of constructing or operating a high-voltage transmission line" over land that is "zoned or used for agricultural purposes." *See* WIS. STAT. § 32.09(6r)(a). In such cases, the jurisdictional offer must "specify" two alternative methods of just compensation: "a lump sum representing just compensation … for outright acquisition of the easement"; and "an amount payable annually …, which amount represents just compensation … for the taking of the easement for one year." *See* § 32.09(6r)(a).

¶17    If the landowner accepts a jurisdictional offer issued in such circumstances, the landowner must at that time "choose between the lump sum and the annual payment method of compensation." WIS. STAT. § 32.09(6r)(b). Alternatively, if the landowner does not accept the jurisdictional offer, and if the utility petitions for and then obtains title to the easement through the statutory process we describe below, the award issued through that process must also specify the two alternative methods of compensation, and the landowner will eventually have to choose between those methods of compensation after the

---

[3] In addition to the permanent interests we have just described, at least some of the jurisdictional offers also include a temporary limited easement for construction purposes, and just compensation for the temporary easement interests. The landowners do not challenge ATC's right to take those temporary easements and we discuss them no further.

statutory process is complete. *See* WIS. STAT. §§ 32.06(8), (10), 32.08(6)(b), 32.09(6r)(a).

¶18    In each of the cases at issue here, ATC's jurisdictional offer specified two alternative methods of compensation. ATC offered a lump-sum amount as compensation for the "Permanent Easement Interests." ATC also offered an alternative amount that "represents just compensation for the Permanent Easement for one year," and "which would be paid to [the] [l]andowner annually for a period of 40 years." According to ATC, it calculated the amount payable annually by dividing the lump sum offer for outright acquisition of the easement by 40, such that each annual payment equals one-fortieth of the lump sum that ATC offered for outright acquisition of each easement. By operation of the statute that imposes the annual payment requirement, the annual payment amount would be subject to increase each year based on a formula that approximates the annual increase in property values from the prior year. *See* WIS. STAT. § 32.09(6r)(c)1. Accordingly, in essence, ATC's annual payment offer was for the lump sum payment offer amortized over a period of 40 years, such that the landowner would ultimately receive an amount equal to the lump sum payment as adjusted to account for the delay in payment.

¶19    If a landowner rejects a jurisdictional offer, WIS. STAT. § 32.06 provides two distinct legal processes, or "tracks," *see Waller*, 350 Wis. 2d 242, ¶92, by which the landowner may challenge issues that arise during the condemnation process. *Id.*, ¶¶64-68; *see also Falkner v. Northern States Power Co.*, 75 Wis. 2d 116, 120-22, 248 N.W.2d 885 (1977). For clarity and consistency, we refer to these two tracks as the "condemnation-and-valuation

proceedings," which are governed by WIS. STAT. § 32.06(7), (8), and (10),[4] and the "right-to-take action," which is governed by § 32.06(5).[5] Condemnation-and-valuation proceedings are initiated in the first instance by the utility, and they are the legal process by which the utility obtains title to the easement after the landowner rejects a jurisdictional offer. *See* § 32.06(7). As relevant here, the landowner can challenge the adequacy of the just compensation offer during the course of the condemnation-and-valuation proceedings. *Waller*, 350 Wis. 2d 242, ¶64. By contrast, a right-to-take action is initiated by the landowner to challenge aspects of a taking other than the adequacy of the amount of compensation offered. *Id.*, ¶67.

¶20 The right-to-take action and the condemnation-and-valuation proceedings take place independently from each other, and "may go on simultaneously." *Falkner*, 75 Wis. 2d at 120 (citing WIS. STAT. § 32.06(5)). Importantly, a landowner's filing of a right-to-take action does not necessarily prevent the condemnor from taking title to the property during the course of the condemnation-and-valuation proceedings that the condemnor initiated. *See Waller*, 350 Wis. 2d 242, ¶¶6, 9; § 32.06(9)(b).

¶21 Here, in each of these cases, the landowner did not accept ATC's jurisdictional offer, and ATC initiated condemnation-and-valuation proceedings

---

[4] Other cases refer to these proceedings by various terms, including the "condemnation proceedings," the "valuation proceeding[s]," and the "just compensation proceeding and appeal." *See, e.g.*, *Waller v. American Transmission Co., LLC*, 2013 WI 77, ¶¶27, 29, 65, 350 Wis. 2d 242, 833 N.W.2d 764; *id.*, ¶176 (A.W. Bradley, J., dissenting); *see also DSG Evergreen Fam. Ltd. P'Ship v. Town of Perry*, 2020 WI 23, ¶26, 390 Wis. 2d 533, 939 N.W.2d 564 (using the term "just compensation case").

[5] Other cases refer to these actions by various terms including "owner's action[s]." *See, e.g.*, *Falkner v. Northern States Power Co.*, 75 Wis. 2d 116, 120, 248 N.W.2d 885 (1977).

by filing a condemnation petition in the circuit court to acquire title to each easement. Pursuant to WIS. STAT. §§ 32.06(7) and (8), the circuit court referred the cases to the county condemnation commission for Iowa County, and the commission made an award of just compensation in each case. Consistent with WIS. STAT. § 32.09(6r)(a), each of the commission's awards specified a lump sum and "an amount payable annually …, which amount represents just compensation … for the taking of the easement for one year."[6] As the next step in the condemnation-and-valuation proceedings, the landowners appealed those awards to the circuit court, as they were entitled to do under § 32.06(10). We take judicial notice of the fact that, as of the issuance of this opinion, the condemnation-and-valuation proceedings for each of the six properties remain pending in the circuit court.

¶22 Meanwhile, each landowner also filed the separate right-to-take actions that are at issue in these appeals. On ATC's motion, the circuit court consolidated the landowners' separate right-to-take actions into two cases for purposes of scheduling and trial.

---

[6] ATC included the commission awards as part of the summary judgment materials. For the Hanson property, the commission awarded a lump sum of $4,800 and annual payments of $100. For the Keeney property, the commission awarded a lump sum of $26,946 and annual payments of $1,350. For the Caygill property, the commission awarded a lump sum of $54,000 and annual payments of $1,300. For the Daentl property, the commission awarded a lump sum of $66,300 and annual payments of $1,200. For the Deer Foot Rock property, the commission awarded a lump sum of $10,500 and annual payments of $500. And for the Hodgson property, the commission awarded a lump sum of $54,000 and annual payments of $1,500.

The commission's awards are notable in at least two respects. First, the commission's awards do not limit the annual payments to any specific duration; instead, on their face, the awards require annual payments that extend indefinitely. Second, the relationship between the amount of the lump sum and the annual payment in the commission's awards varies widely, and it is thus apparent that the commission did not calculate the annual payments by simply dividing the lump sum by a specific number of years, as ATC did in its jurisdictional offers.

¶23    In these right-to-take actions, the landowners request orders declaring, among other things, that ATC's jurisdictional offers are "null and void" and that ATC did not have the right to take the easements under the terms set forth in the jurisdictional offers. As stated, the landowners allege that the jurisdictional offers are defective in two respects. First, the 40-year limit ATC placed on the annual payment method of compensation violates WIS. STAT. § 32.09(6r), which, the landowners contend, requires that annual payments continue as long as the property is "zoned or used for agricultural purposes." Second, the easements violate WIS. STAT. § 182.017(7)(h) because they grant ATC the right to access lands and remove hazard trees "beyond the boundaries of the easement[s]."[7]

¶24    ATC moved for summary judgment in each of the cases. In its briefs in support of summary judgment, ATC argued that the landowners could not challenge the 40-year limit in a right-to-take action. ATC further argued that the limit is consistent with WIS. STAT. § 32.09(6r), but that even if it violates that statute, the violation is a technical one that did not require the dismissal of the petitions to acquire title to the easements that ATC filed in the condemnation-and-valuation proceedings. Finally, with respect to WIS. STAT. § 182.017(7)(h), ATC emphasized that the easement itself granted ATC the right to remove hazard trees outside of the transmission line easement strip; therefore, ATC argued, those rights are within "the boundaries of the easement[s]," as that phrase is used in § 182.017(7)(h). The landowners opposed ATC's motions.

---

[7] In the right-to-take action pertaining to the Hodgson easement, the landowners made a related argument about the Hodgson-specific access provisions. We discuss the particulars of the Hodgsons' argument, ATC's response, and the circuit court's resolution in section III below.

¶25    Following briefing, the circuit court issued separate opinions that collectively granted summary judgment to ATC in each of the landowners' cases. The court concluded that the landowners could not challenge the 40-year limit on annual payments in a right-to-take action, and that even if they could, that limit does not violate WIS. STAT. § 32.09(6r).   The court further concluded that the hazard-tree-rights provision does not violate WIS. STAT. § 182.017(7)(h).

¶26    The landowners appealed the orders granting summary judgment in favor of ATC.  On ATC's motions, we consolidated all of the landowners' appeals for purposes of briefing and disposition.[8]

## DISCUSSION

¶27    On appeal, "[w]e review an order for summary judgment de novo, using the same methodology as the circuit court." *Yahnke v. Carson*, 2000 WI 74, ¶10, 236 Wis. 2d 257, 613 N.W.2d 102.   Under WIS. STAT. § 802.08(2), "summary judgment must be entered 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).  Here, the parties agree that there are no genuine disputes of material fact, and that the issues raised by the landowners on appeal can be decided as matters of law.

---

[8] These consolidated appeals originally included a seventh appeal, *Paull v. American Transmission Company LLC*, No. 2023AP1428, which raised identical issues.  In an August 27, 2024 order, we dismissed that appeal after receiving a notice of voluntary dismissal that was filed by the Paulls and ATC.

¶28 The two challenges raised by the landowners turn on questions of statutory interpretation and the interpretation of the easements, which are questions of law that we review independently of the circuit court. *Nowell v. City of Wausau*, 2013 WI 88, ¶19, 351 Wis. 2d 1, 838 N.W.2d 852 (statutory interpretation); *Garza v. American Transmission Co. LLC*, 2017 WI 35, ¶19, 374 Wis. 2d 555, 893 N.W.2d 1 ("The proper construction of an easement is a question of law that we review de novo." (citation omitted)).

## I. The Landowners' Challenge to the 40-Year Limit on Annual Payments

¶29 We begin with the parties' arguments about the 40-year limit in ATC's jurisdictional offers, and whether those limits violate WIS. STAT. § 32.09(6r)(a). As a threshold issue, ATC argues that the landowners cannot raise this challenge in a right-to-take action. Because it is difficult to understand the parties' arguments about this threshold issue without a basic understanding of their substantive dispute over the requirements of § 32.09(6r)(a), we briefly preview the parties' competing interpretations of that statute.

¶30 As stated, the parties dispute whether WIS. STAT. § 32.09(6r) allows ATC to limit the duration of annual payments it offers under that statute. According to the landowners, the annual payments contemplated by § 32.09(6r) continue indefinitely, except that § 32.09(6r)(c)2. provides that the annual payments "shall cease" under one specific circumstance—if the land at issue is "no longer zoned or used for agricultural purposes." The landowners characterize ATC's decision to limit the payments to 40 years as "arbitrary" and unsupported by any statutory language. By contrast, ATC argues that the statute necessarily requires a stopping point for the annual payments. This is because, ATC contends, the two alternative methods of payment reflect the same "measure of

15

compensation," and a landowner must receive an "equal amount" of compensation whether the landowner chooses to receive the lump sum or the annual payment method of compensation. At bottom, this dispute is best understood as a disagreement about the function of the annual payments. According to the landowners, each annual payment functions as just compensation for the right to use the easement for a single year. And according to ATC, the annual payments instead function in the aggregate as just compensation for outright acquisition of the easement as amortized over a number of years (that is, paid in installments that are adjusted to account for the increase in statewide property values over the years).

¶31 Having summarized the issue, we turn to ATC's threshold argument about whether the landowners' challenge to the annual payment terms can be brought in a right-to-take action.

## A. The Right-to-Take Action

¶32 We begin our analysis by providing additional information about the differences between the two tracks—the condemnation-and-valuation proceedings and the right-to-take action—that can be used to address different aspects of a taking. As mentioned, these two tracks can proceed independently from each other, and "may go on simultaneously." *Falkner*, 75 Wis. 2d at 120 (citing WIS. STAT. § 32.06(5)).

¶33 We start by describing the condemnation-and-valuation proceedings, which take place in the circuit court and before the county's condemnation commission. As we have discussed, such proceedings are initiated by the utility after a landowner declines to accept a jurisdictional offer. In those circumstances, the utility files a petition in the circuit court pursuant to WIS. STAT. § 32.06(7).

16

*Waller*, 350 Wis. 2d 242, ¶64. After receiving the petition, the court considers whether the utility has established the necessity of the taking, and then assigns the matter to the commission for further proceedings. *See* § 32.06(7).

¶34 The commission then conducts a hearing to value the property or interests that the utility intends to take, and it "make[s] a written award specifying therein the property taken and the compensation" that the commission determines is just. *See* WIS. STAT. § 32.08(6)(b); *Waller*, 350 Wis. 2d 242, ¶65. In the case of a taking of an easement for a high-voltage electric transmission line over land zoned or used for agricultural purposes, the commission's award must specify both of the two alternative forms of just compensation discussed above—the lump sum, and the amount payable annually. *See* WIS. STAT. § 32.09(6r)(a). The commission files its award with the circuit court and, if the court approves the award, the utility pays the amount of the award (either to the landowner or to the circuit court clerk). *See* WIS. STAT. §§ 32.06(8), 32.08(6)(b). At that point, "[t]itle to the property taken shall vest in the condemnor." *See* § 32.06(9)(b).

¶35 Either party may appeal the commission's award to the circuit court. *See* WIS. STAT. § 32.06(10). Unless the parties agree to a bench trial, the matter is tried before a jury. Aside from certain issues about defects and encumbrances on the title, which can also be raised in these appeals, the issue to be tried is limited to "the amount of just compensation paid by the condemnor." *See* § 32.06(10); *Waller*, 350 Wis. 2d 242, ¶65. During the trial, neither "[t]he amount of the jurisdictional offer or of the commission's award" is "disclosed to the jury." *See* § 32.06(10). Again, if the case pertains to the taking of an easement for a high-voltage electric transmission line over agricultural land, the jury's verdict must specify damages to the landowner in both of the two alternative forms discussed

17

above—a lump sum and an amount payable annually. *See* WIS. STAT. § 32.09(6r)(a).

¶36 Although "[t]he matter of just compensation" is often "the crucial issue in any public taking," *Arrowhead Farms, Inc. v. Dodge County*, 21 Wis. 2d 647, 651, 124 N.W.2d 631 (1963), a landowner may also seek to challenge "the right of the condemnor to condemn the property described in the jurisdictional offer" for reasons "other than that the amount of compensation offered is inadequate." *DSG Evergreen Fam. Ltd. P'ship v. Town of Perry*, 2020 WI 23, ¶22, 390 Wis. 2d 533, 939 N.W.2d 564 (quoting WIS. STAT. § 32.06(5)). If so, the landowner's means to do so is by filing a right-to-take action under § 32.06(5). *See, e.g.*, *Waller*, 350 Wis. 2d 242, ¶¶66-69. This is the type of action at issue in these appeals.

¶37 We pause to observe that the label "right-to-take action" has the potential to be misleading. This is because this label could imply that the landowner is claiming that the condemnor does not have the right to take the property through an exercise of eminent domain authority under any circumstances—even if the condemnor were to follow all required steps and issues a jurisdictional offer that is free of defects. However, consistent with the expansive language of WIS. STAT. § 32.06(5), Wisconsin courts have given right-to-take actions a broader construction, and have determined that a right-to-take action may be the appropriate mechanism to bring certain claims even if "the right

of condemnation is not being directly contested." *Waller*, 350 Wis. 2d 242, ¶92.[9]
By way of example, courts have allowed right-to-take actions based on a condemnor's failure to follow statutorily required procedural steps prior to issuing a jurisdictional offer.[10] Additionally, courts have also allowed right-to-take actions that challenge defects in a jurisdictional offer that could easily be corrected by the condemnor issuing an amended jurisdictional offer.[11]

¶38 To initiate a right-to-take action after receiving a jurisdictional offer, the landowner must promptly file the action in the circuit court. WIS. STAT. § 32.06(5) (requiring the right-to-take action to be filed within 40 days after the jurisdictional offer is served on the landowner). Importantly, although the right-to-take action is to be "given precedence over all other actions in said [circuit] court then not on trial," the "commencement" of a right-to-take action does not

---

[9] *See also* ***Arrowhead Farms, Inc. v. Dodge County***, 21 Wis. 2d 647, 651, 124 N.W.2d 631 (1963) (contemplating that "all collateral procedural issues" should be "resolved" in a right-to-take action); ***Wisconsin Town House Builders, Inc. v. City of Madison***, 37 Wis. 2d 44, 154 N.W.2d 232 (1967) (challenging, in a right-to-take action, a jurisdictional offer's alleged failure to state the nature of the project, describe the property and the interests to be taken, or itemize the damages).

[10] *See, e.g.*, ***Warehouse II, LLC v. DOT***, 2006 WI 62, ¶9, 291 Wis. 2d 80, 715 N.W.2d 213 (allowing a right-to-take action based on condemnor's failure to negotiate in good faith prior to issuing a jurisdictional offer); *see also* ***Arrowhead Farms***, 21 Wis. 2d at 651 (any dispute about whether the condemnor negotiated in good faith should have been raised in a right-to-take action).

[11] *See, e.g.*, ***Wieczorek v. City of Franklin***, 82 Wis. 2d 19, 260 N.W.2d 650 (1978) (challenging a jurisdictional offer's failure to include a proposed date of occupancy in a right-to-take action).

necessarily prevent the condemnor "from proceeding with condemnation during the pendency of the [right-to-take] action." *See* § 32.06(5).[12]

¶39   Having provided additional background about these two tracks, we turn to the parties' arguments about whether the landowners in these cases properly challenged the 40-year limit on the annual payments in this right-to-take action. ATC argues that the landowners' challenge raises an issue about the "amount of just compensation offered," and therefore should be addressed in the condemnation-and-valuation proceedings instead of in these right-to-take actions. This is so, ATC contends, because the annual payment requirement is found in the statutory section titled "rules governing just compensation," *see* WIS. STAT. § 32.09, and because the legal determination of whether ATC can limit the duration of the annual payments will affect the amount of just compensation that the landowners will ultimately receive if they elect to receive annual payments. The landowners disagree that their challenge is the proper subject of a condemnation-and-valuation proceeding. They point out that they are not

---

[12] Although the following observation is not directly germane to our resolution of these appeals, we observe that the two track system of simultaneous right-to-take actions and condemnation-and-valuation proceedings does not always result in an orderly method of resolving disputes in the exercise of the eminent domain power. This appears to be contrary to what was envisioned when the legislature enacted the statutes that established these two tracks. *See Arrowhead Farms*, 21 Wis. 2d at 651 (stating that the "statutory scheme provides an orderly method of resolving the disputes involved in the exercise of the eminent domain power," and that the availability of a right-to-take action allows "all collateral procedural issues [to] be resolved before either the [county condemnation commission] or the court turns to the matter of just compensation" in the condemnation-and-valuation proceedings). Case law reflects that the statutory scheme does not always meet the *Arrowhead* court's expectation of efficiency. In reality, right-to-take proceedings may drag on for years, and sometimes (as in these cases) the right-to-take action is not resolved until long after the condemnor has already taken title to the property in the course of the condemnation-and-valuation proceedings and begun construction on the condemned property. *Waller*, 350 Wis. 2d 242, ¶¶132, 152 (A.W. Bradley, J., dissenting) (describing the "concurrent dual proceedings" that can occur as having "the potential" to result in "procedural quagmires").

challenging the *amount* of each annual payment ATC offered and are instead challenging ATC's right to cap the *duration* of the annual payments. According to the landowners, if the limits on the annual payments violate § 32.09(6r), then ATC's jurisdictional offers are defective, and the defect must be addressed in a right-to-take action even if it may have some effect on the amount of compensation that the landowners might ultimately receive.

¶40     There is some intuitive appeal to ATC's argument. As we have explained, the ultimate dispute is about whether the annual payments required by WIS. STAT. § 32.09(6r) terminate after a certain number of years, or whether they must extend as long as the property is zoned or used for agricultural purposes. This is a legal question, and its resolution will undoubtedly affect the amount of just compensation that the landowners will receive if they select the annual payment method of compensation. The landowners do not identify any reason that the arguments they raise about the proper interpretation of § 32.09(6r) could not be addressed by the condemnation commission and the circuit court in the course of the condemnation-and-valuation proceedings. Indeed, the condemnation commission and the circuit court must both resolve the parties' dispute, at least implicitly, in the course of the condemnation-and-valuation proceedings.[13]

---

[13] For its part, the condemnation commission was already tasked with specifying annual payments when it made its awards of just compensation and, as stated, its awards placed no limit on the duration of the payments. *See supra*, ¶21 n.6. Likewise, if the condemnation-and-valuation proceedings that are pending in the circuit court proceed to jury trials, the court will be required to instruct the jury on how it should determine the amount of the annual payments—specifically, whether the annual payments are to equal the lump sum for outright acquisition divided by a specified number of years, or whether they instead function as compensation for the use of the easement for a single year. And, if any of the landowners elect to receive annual payments, the court will be required to enter a judgment that states the terms of those annual payments, including whether there is a limit on the duration of payments.

¶41    However, as we have explained, our supreme court has taken an expansive view of the types of claims that are properly brought in a right-to-take action. In *Waller*, for example, the court concluded that a right-to-take action was "the proper and exclusive way" for a landowner to "raise a claim that the owner will be left with an uneconomic remnant after a partial taking." *Waller*, 350 Wis. 2d 242, ¶6. There, the Wallers argued that the taking of an easement over their parcel destroyed the value of the portion that remained after the taking, rendering it an uneconomic remnant as defined by WIS. STAT. § 32.06(3m). *Id.*, ¶26. Therefore, the Wallers argued, the utility should have offered to take and to pay for their entire parcel, not just the easement, when the utility issued the jurisdictional offer. *Id.* Our supreme court recognized that the Wallers' argument was "undoubtedly … related to the total amount owed to a condemnee," but the court nevertheless determined that the claim was properly brought in the right-to-take action. *Id.*, ¶90.

¶42    ATC does not cite *Waller* at all in its appellate brief, much less does ATC engage with *Waller*'s discussion about the proper scope of right-to-take actions. And it is not immediately apparent that we could agree with ATC's position without disregarding this aspect of *Waller*. To the extent that it could be argued that this aspect of *Waller* is inapt based on differences between uneconomic remnant claims and the claims about the limitation on the duration of the annual payments that are at issue in these cases, ATC does not make any such argument in its appellate briefing, and we will not develop that argument for ATC. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). Under the circumstances, and based on the arguments presented in these appeals, we conclude that the landowners' challenges are the proper subjects of their right-to-take actions.

## B. WIS. STAT. § 32.09(6r)'s Annual Payment Requirement

¶43    We next address whether the 40-year limit on the annual payments offered in the jurisdictional offers violate WIS. STAT. § 32.09(6r).   Whether a utility may place a 40-year limit on the annual payments that it offers is an issue of first impression and presents a question of statutory interpretation, which we review de novo.  *Nowell*, 351 Wis. 2d 1, ¶19.

¶44    In answering this question, we start with the language of WIS. STAT. § 32.09(6r).  *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶¶44-45, 271 Wis. 2d 633, 681 N.W.2d 110.  As noted, § 32.09(6r)(a) requires that, if a utility seeks to take an easement for a high-voltage electric transmission line over land that is zoned or used for agricultural purposes, the utility's jurisdictional offer (as well as any award by the condemnation commission and any jury verdict in the condemnation-and-valuation proceeding) must:

> specify, in addition to a lump sum representing just compensation under sub. (6) for outright acquisition of the easement, an amount payable annually on the date therein set forth to the condemnee, which amount represents just compensation under sub. (6) for the taking of the easement for one year.[14]

---

[14]   Although it has no apparent bearing on the issues in these cases, we observe that WIS. STAT. § 32.09(6r)'s cross-references to § 32.09(6) may be a mistake, and that the legislature may have intended to cross-reference § 32.09(6g) instead.  The problem with WIS. STAT. § 32.09(6r)'s cross-references to "just compensation under sub. (6)" is that subsec. (6r) governs just compensation for the taking of certain easements, and subsec. (6) explicitly governs the method for determining just compensation for the "partial taking of property *other than an easement*."  (Emphasis added.)  It is a different subsection, (6g), that generally governs the determination of just compensation for the taking of an easement.  We observe that § 32.09(6g) and (6r) were both enacted by 1977 Wis. Act 440, and that prior to Act 440, subsec. (6) governed the determination of just compensation for all partial takings, including easements.  The parties do not mention this issue in their briefing, nor do they argue that it has any bearing on the proper interpretation of the statute.  We therefore address the issue no further.

¶45    By its terms, WIS. STAT. § 32.09(6r)(a) requires a utility to offer two different methods of compensation, and does not expressly authorize a utility to impose any limit on the duration of the annual payment method of compensation.

¶46    Nor is there any language in the remaining provisions of WIS. STAT. § 32.09(6r) that authorizes a utility to impose any limit on the duration of annual payments. *See **Kalal***, 271 Wis. 2d 633, ¶46 (statutory language must be interpreted in context). Indeed, the only provision in subsec. (6r) that expressly addresses the duration of annual payments is subdiv. (c)2. As relevant here, that subdivision provides that "the right to receive the annual payment method of compensation … shall cease" "[i]f the lands which are zoned or used for agricultural purposes and which are condemned and compensated by the annual payment method of compensation … are no longer zoned or used for agricultural purposes."[15] *See* § 32.09(6r)(c)2. To give this provision meaning, the converse must also be true—the landowner has a continuing right to receive annual payments so long as the land continues to be zoned or used for agricultural purposes (provided that the landowner has not waived the right to receive payments). The legislature did not provide any other limitation on the duration of annual payments, and reading language into a statute that the legislature itself did not see fit to add runs counter to basic principles of statutory construction. *See*

---

[15] For context, we note that the remaining subdivisions in WIS. STAT. § 32.09(6r)(c) identify two other circumstances, neither of which pertain to these cases. Both are based on the concept of "waiver," in which a landowner who elected to receive the annual payment method of compensation may no longer be entitled to receive such payments. More specifically, § 32.09(6r)(c)1. provides that landowners who are entitled to receive annual payments may "waive in writing [their] right … to receive such payments," and further provides that a landowner's "successor in interest shall be deemed to have waived such right until the date on which written notice of [the successor's] right to receive annual payments is received by the condemnor."

*State v. Wiedmeyer*, 2016 WI 46, ¶13, 370 Wis. 2d 187, 881 N.W.2d 805 ("It is not up to the courts to rewrite the plain words of statutes[.]"); *State v. Fitzgerald*, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 165 ("[W]e interpret the words the legislature actually enacted into law.").

¶47 ATC acknowledges that WIS. STAT. § 32.09(6r) does not expressly grant it authority to limit the duration of annual payments to any specified number of years. Instead, ATC takes the position that § 32.09(6r) must be interpreted to implicitly authorize a limit on the duration of payments. This is so, ATC asserts, because the statute requires that a landowner receive an "equal amount" of total compensation, regardless of which method of compensation the landowner selects. Based on this underlying premise, ATC reasons that the landowner cannot receive more in annual payments than the landowner would receive if the landowner accepted the lump sum offer. And, if the landowner cannot receive annual payments that exceed the lump sum offer, then the annual payments cannot continue indefinitely, and instead must necessarily cease after a certain number of years, once the landowner has received a total amount of annual payments that equal the lump sum offer as adjusted under § 32.09(6r)(c)1. to account for increasing property values.

¶48 ATC makes two arguments in support of its assertion that the landowner must receive an "equal amount" of compensation under either method of compensation.

¶49 First, ATC asserts that the "lump sum payment is the [only] measure of compensation due the landowner." In other words, in ATC's view, the legislature intended the amount payable annually to reflect the same value

measure (just compensation for outright acquisition of the easement) as the lump sum, but amortized over an unspecified number of years.

¶50 This argument fails because it is unmoored from and inconsistent with the statutory language. By its unambiguous language, WIS. STAT. § 32.09(6r)(a) requires two different methods of compensation, and the two methods represent two different values. The lump sum represents just compensation "*for outright acquisition of the easement*." (Emphasis added.) By contrast, the annual payments represent just compensation "*for the taking of the easement for one year*." *See* § 32.09(6r)(a) (emphasis added). That is, based on the unambiguous language of the statute, the annual payments are meant to reflect just compensation for the property rights a utility has taken for a single year, not, as ATC argues, just compensation for outright acquisition of the easement, amortized over a period of years. "[W]here the legislature uses similar but different terms in a statute, particularly within the same section, we may presume it intended the terms to have different meanings." *State ex rel. DNR v. Wisconsin Ct. of Appeals Dist. IV*, 2018 WI 25, ¶28, 380 Wis. 2d 354, 909 N.W.2d 114 (citations omitted).

¶51 Second, ATC points to WIS. STAT. § 32.09(6r)(c)2., which, as discussed, provides that, if the lands are no longer zoned or used for agricultural purposes, the condemnee's right to receive annual payments "shall cease." Subdivision (c)2. further provides that, should that occur, the condemnor "shall" make "a single payment" to the landowner that is "equal to the difference between the lump sum representing just compensation under sub. (6) and the total amount of annual payments previously received" by the landowner. According to ATC, this provision "prevents the total amount of annual payments from exceeding the lump sum value."

¶52    We disagree. It is certainly true that WIS. STAT. § 32.09(6r)(c)2. prevents a condemnee from receiving *less* in annual payments than the amount of the lump sum offer if the land is rezoned or no longer used for agricultural purposes. However, nothing in § 32.09(6r)(c)2. prevents the condemnee from receiving a total amount of annual payments that *exceeds* the value of the lump sum offer, provided that the land continues to be zoned or used for agricultural purposes.

¶53    Apart from these two arguments, ATC offers no other support for the premise that the legislature intended these two methods of compensation to result in an equal amount of total compensation.

¶54    For all these reasons, we conclude that WIS. STAT. § 32.09(6r)(a) does not allow ATC to limit the duration of the annual payments to any specific number of years. Putting to the side any situations in which a landowner waives the right to receive payment, the statute unambiguously requires a utility to offer annual payments (the amount of which reflects the value of the taking of the easement for one year) that will continue until the land is no longer zoned or used for agricultural purposes.[16] We therefore conclude that the 40-year limit that ATC placed on its annual payment offers violates § 32.09(6r)(a).

---

[16] A court may consult the legislative history of a statute to confirm its interpretation of a statute, and we have done so here. *See* ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶51, 271 Wis. 2d 633, 681 N.W.2d 110 ("legislative history is sometimes consulted to confirm or verify a plain-meaning interpretation"). The legislative history of WIS. STAT. § 32.09(6r)(a) confirms that the legislature did not intend the lump sum payments for outright acquisition of the easement to be the only measure of just compensation, as ATC asserts. Instead, based on the legislative history that we now briefly summarize, it is evident that the legislature intended to give agricultural landowners a meaningful choice between two distinct measures of compensation, including an annual payment that functions as just compensation for the use of an easement for a single year.

(continued)

## C. Remedy

¶55    Having concluded that ATC's jurisdictional offers violate Wis. Stat. § 32.09(6r)(a), we now consider the appropriate remedy.  The parties frame the issue as turning on whether the defect is "technical" or "jurisdictional," a framework that comes from *Warehouse II, LLC v. DOT*, 2006 WI 62, 291 Wis. 2d 80, 715 N.W.2d 213.  Based on the discussion in *Warehouse II*, the parties appear to agree on the following.  If we conclude that the 40-year limit is a "jurisdictional" defect in the jurisdictional offers, then the jurisdictional offers are "void," and ATC did not validly commence the condemnation-and-valuation proceedings in which it obtained title to the easements.  *Id.*, ¶¶1, 3 & n.5.  If, by

---

WISCONSIN STAT. § 32.09(6r)'s annual payment requirement was first passed into law by 1977 Wis. Act 440.  However, the concept of the annual payment method of compensation was developed in the prior legislative session, as a part of a package of legislation that also regulated the condemnation of land for transmission lines.  *See* 1975 Wis. Laws ch. 68 ("Act 68").

A prototype of the annual payment method of compensation first appeared in the initial drafts of Act 68.  In those initial drafts, high-voltage transmission line easements were envisioned to be limited-term easements that the utility would lease for "the maximum expected useful life of the transmission line," and an annual payment, made for "the maximum expected useful life of the transmission line," was the sole proposed method of just compensation.  The annual payments would be calculated based on "the cost of agricultural production, changes in land values and changes in farming practices," and the state public service commission would determine the multiplier that would be used to increase the annual payments "at the beginning of the easement period and every 5 years thereafter."  Some later amendments to the proposed legislation omitted any language that would have limited the term of the easement to the life of the transmission line, and some later amendments also required that the utility offer the landowner a choice between compensation via a lump sum and annual payments.  These later amendments proposed different ways that annual payments, which were to "represent[] just compensation under [Wis. Stat. §] 32.09 for the taking of such property for one year," would be initially determined and then adjusted over time.  In some of these later iterations, the draft legislation contained language that was very similar to the language that currently exists in § 32.09(6r)(a).

The annual payment requirement was ultimately excluded from the final version of Act 68, but it was enacted the following year as part of 1977 Wis. Laws ch. 440 ("Act 440").  As relevant here, Act 440 created Wis. Stat. § 32.09(6r)(a) and, apart from adding the provision that is currently contained in § 32.09(6r)(c)1., its language remained virtually unchanged between the initial and final drafts.

contrast, we conclude that the defect is not "jurisdictional," the violation can be cured and does not void the ongoing condemnation-and-valuation proceedings. *Id.*, ¶11.

¶56    We resolve this issue based on the specific nature of the defect in the jurisdictional offer and arguments that are made by the parties in these appeals, in light of case law that could point in inconsistent directions. With those limitations in mind, we conclude that the landowners fail to persuade us that the proper remedy in these cases is to void the ongoing condemnation-and-valuation proceedings. Our decision is based in large part on language from *City of Racine v. Bassinger*, 163 Wis. 2d 1029, 1036-37, 473 N.W.2d 526 (Ct. App. 1991), which the *Warehouse II* court found to be relevant and persuasive on the topic of remedies. As applied here, and for reasons we now explain, we conclude that it would make no sense to void the jurisdictional offers and the easements that ATC has now obtained in the condemnation-and-valuation proceedings based on the defects in the jurisdictional offers, which can be (and indeed already have been) remedied in the separate condemnation-and-valuation proceedings that are pending in the circuit court.

¶57    We begin by describing the framework set forth in *Warehouse II*. There, the department of transportation commenced condemnation-and-valuation proceedings regarding property owned by Warehouse, and Warehouse challenged the taking in a right-to-take action.[17]   *Id.*, ¶2. The circuit court found that the

---

[17] The condemnation at issue in *Warehouse II* was governed by WIS. STAT. § 32.05, which is a special condemnation procedure that pertains to takings for sewers and transportation. There are some differences between the provisions in § 32.05 and the provisions in WIS. STAT. § 32.06, which apply here, but none are material to our discussion.

29

department failed to negotiate in good faith prior to issuing the jurisdictional offer, as the department was statutorily required to do. *Id.*, ¶3. Thus, the court determined, the department failed to fulfill "a jurisdictional prerequisite to the exercise of eminent domain power" before commencing the condemnation-and-valuation proceedings. *Id.*, ¶3 & n.5. On appeal, the parties disputed whether Warehouse was entitled to its attorney fees pursuant to WIS. STAT. ch. 32's fee-shifting provision. *See* WIS. STAT. § 32.28(3) (providing that a landowner is entitled to an award of litigation expenses if "[t]he court determines that the condemnor does not have the right to condemn part or all of the property described in the jurisdictional offer").

¶58     On review, our supreme court stated that the resolution of that issue turned on whether the failure to negotiate in good faith prior to issuing a jurisdictional offer was a "jurisdictional defect." *Warehouse II*, 291 Wis. 2d 80, ¶7. It cited two prior opinions, both of which held that such negotiation "is a necessary condition of conferring jurisdiction upon the [county condemnation committee] and the court" in the condemnation-and-valuation proceedings. *Id.*, ¶6 (citing *Arrowhead Farms*, 21 Wis. 2d at 652); *id.*, ¶¶7-8 (citing *Herro v. Natural Resources Bd.*, 53 Wis. 2d 157, 192 N.W.2d 104 (1971)).

¶59     The *Warehouse II* court went on to discuss other potential defects, beyond a failure to negotiate. According to the court, "[i]t cannot be disputed that the [condemnor] must issue a jurisdictionally sufficient jurisdictional offer to purchase before it has the statutory right to proceed with the condemnation." *Id.*, ¶9. However, "not every defect in a jurisdictional offer to purchase is a jurisdictional defect." *Id.*, ¶10. If a defect is merely "technical," such as failing to include a date of occupancy, the condemnor may cure the defect by issuing an amended jurisdictional offer, provided that the landowners were not prejudiced by

the defect. *Id.*, ¶11; *see also id.*, ¶10 ("a technical defect does not go to the primary purpose underlying the statutory process, and if it does not prejudice the opposing party it is insufficient to cause dismissal of the action").

¶60 The court then quoted a passage from *Bassinger*, which the *Warehouse II* court found to be "persuasive." *Warehouse II*, 291 Wis. 2d 80, ¶12 (quoting *Bassinger*, 163 Wis. 2d at 1036-37). In the quoted passage, the *Bassinger* court stated:

> The procedural steps which [in other cases] have been found to be jurisdictional in condemnation proceedings all have two significant features in common. The first is that they are contained within the particular statute which sets forth the condemnation procedure, that is, the things which must be done to have and to exercise the power to acquire property by eminent domain in each particular case. The second is that the statute expressly or impliedly denies the power of the condemnor to act unless the particular step is taken, and no other statutory remedy is provided for a failure to perform the particular step. The only remedy which exists is to challenge the condemnation itself under [the right-to-take statutes]. If the property owner prevails, the result is a voiding of the acquisition of the property.

*Bassinger*, 163 Wis. 2d at 1036-37 (initial brackets in original, emphasis and internal footnotes omitted).

¶61 Ostensibly applying that reasoning, the *Warehouse II* court determined that a failure to negotiate prior to issuing a jurisdictional offer "strikes at the heart of" the "driving force behind the condemnation statutes," which is to "achieve fair compensation for the property owner." *Warehouse II*, 291 Wis. 2d 80, ¶13. Therefore, the court determined, the department's failure to negotiate in good faith was a fundamental defect, *id.*, and Warehouse was entitled to the litigation expenses it incurred in the right-to-take proceeding, *id.*, ¶34.

¶62    We question whether this framework from *Warehouse II* governs the applicable remedy here in light of our supreme court's subsequent statements in *Waller*, 350 Wis. 2d 242.  In *Waller*, which was issued several years after *Warehouse II*, the dispute centered on whether the condemnor's jurisdictional offer was consistent with WIS. STAT. § 32.09(3m).  That statute contains mandatory language, which provides in pertinent part:  "If acquisition of only part of a property would leave its owner with an uneconomic remnant [as defined by § 32.09(3m)], the condemnor shall offer to acquire the remnant concurrently[.]" *Waller*, 350 Wis. 2d 242, ¶63 (quoting § 32.09(3m)).  The *Waller* court determined that the jurisdictional offer violated § 32.09(3m) because the condemnor failed to offer to purchase an uneconomic remnant that resulted from the taking, and the condemnor "did not have the right to condemn only the part of the property [that was] 'sought to be taken' in the jurisdictional offer." *Id.*, ¶107.

¶63    Despite these conclusions, the *Waller* court did not apply the framework set forth in *Warehouse II* to determine the remedy for the violation. That is, the *Waller* court did not consider whether the violation was "jurisdictional" or "technical"—indeed, *Waller* did not use those terms at all.  Nor did the *Waller* court suggest that the condemnation-and-valuation proceedings, in which the condemnor acquired title to the easement, were void as a result of the violation.  To the contrary, the *Waller* court expressly stated that the problem with the jurisdictional offer did not require the condemnation-and-valuation proceedings to be dismissed.  At the outset of the opinion, the court stated:  "A right-to-take action … shall not prevent the condemnor from … taking any property interest whose condemnation is not being directly contested by the owner." *Id.*, ¶6.  Then, after concluding that the jurisdictional offer violated WIS. STAT. § 32.09(3m), and that the condemnor lacked the right to condemn the part of

the property sought to be taken in the jurisdictional offer without also condemning the remainder of the Wallers' parcel, the court stated: "It is important to stress that the two tracks—the right-to-take action and the [condemnation-and-valuation] proceeding …—can proceed simultaneously, and nothing should stop a utility like ATC from getting easements so that projects can move forward, so long as the right of condemnation is not being directly contested." *Id.*, ¶92.

¶64 An argument could be made that, at a minimum, these statements from *Waller* temper some aspects of *Warehouse II*, if they do not entirely overrule the framework from that case. That said, the parties in these appeals do not discuss this aspect of *Waller*, much less do they grapple with any of the consequential issues to which we have just alluded.[18] We therefore assume without deciding that *Waller* did not overrule *Warehouse II*. As we now explain, the landowners have not persuaded us that the defect is "jurisdictional," as that term is used in *Warehouse II*.

¶65 Here, as noted, the 40-year limits that ATC placed on the annual payments it offered in its jurisdictional offers are not permitted by Wis. Stat. § 32.09(6r)(a). This is a problem, and the property owners are entitled to a

---

[18] Indeed, both sets of arguments on the issue of remedy are cursory. For their part, the landowners merely assert that ATC's failure to offer annual payments that extend indefinitely is "like failing to negotiate in good faith," and that "the defect is fundamental" because the primary purpose of the eminent domain procedure "is to ensure that the landowner receives a jurisdictional offer that complies with Wisconsin law and provides all the applicable rights that the legislature set forth in [Wis. Stat. ch.] 32." For its part, ATC's argument appears to assume that its interpretation of Wis. Stat. § 32.09(6r) is correct; ATC does not meaningfully engage with the separate issue of what remedy would be appropriate if we reject its interpretation of § 32.09(6r).

declaration that the jurisdictional offers violate § 32.09(6r) by imposing an unauthorized condition on the annual payments.[19]

¶66    Yet, as the *Warehouse II* court acknowledged, "not every defect in a jurisdictional offer to purchase is a jurisdictional defect." *Warehouse II*, 291 Wis. 2d 80, ¶10. As stated, the court looked to the language from *Bassinger*, which considered whether the requirement that the condemnor violated was "contained within the particular statute [that] sets forth the condemnation procedure"; whether the statute "expressly or impliedly denied the power of the condemnor to act unless the particular step is taken"; and whether "no other statutory remedy is provided for a failure to perform the particular step." Here, there is no dispute that the annual payment requirements are contained within the eminent domain statutes. However, the landowners do not make, much less develop, any argument about the remaining considerations from *Bassinger*. That is, they do not argue that the eminent domain statutes "expressly or impliedly den[y] [ATC's] power … to act unless" it issues a jurisdictional offer that is free from defects of this nature. Nor do the landowners argue that the problem with ATC's annual payment offers cannot be remedied through other procedural avenues.

¶67    We conclude that this last point is particularly significant, given the circumstances here. As we have discussed, the problem with ATC's jurisdictional offers can be—and now will be—fully resolved in the course of the

---

[19] The parties did not cite WIS. STAT. § 32.28, the statute which governs the award of litigation expenses in right-to-take actions, in the summary judgment briefing in the circuit court, nor do they cite that statute on appeal. They make no arguments about whether the landowners would be entitled to their litigation expenses if we conclude that the annual payment offer in ATC's jurisdictional offers violates WIS. STAT. § 32.09(6r), nor do the landowners ask us to remand to the circuit court for a determination of litigation expenses under § 32.28. We therefore do not address the potential issue of the landowners' entitlement to litigation expenses.

condemnation-and-valuation proceedings that are currently underway. To repeat, WIS. STAT. § 32.09(6r)(a) requires the condemnation commission's award and the jury verdict to specify "an amount payable annually" that "represents just compensation … for the taking of the easement for one year." And, as we have explained, it appears that the commission's awards, which awarded ATC title to the easements, do not contain any limit on the duration of annual payments. *See supra*, ¶21 n.6. Likewise, in any future jury trials on the issue of just compensation, the circuit court will be bound by our interpretation of § 32.09(6r)(a) when crafting the jury instructions and special verdict forms. Thus, at the end of the condemnation-and-valuation proceedings, the landowners will have the opportunity to choose between receiving a lump sum or annual payments that comply with § 32.09(6r)(a). The landowners do not make any persuasive argument that a defect that can and will be resolved so readily in the condemnation-and-valuation proceedings warrants the extreme remedy of voiding all proceedings that followed ATC's defective jurisdictional offers.

¶68 To summarize our conclusions regarding the issues the landowners raise pertaining to WIS. STAT. § 32.09(6r), we conclude, based on the specific arguments advanced by the parties, that the landowners' challenge to the 40-year limits on annual payments in the jurisdictional offers can be brought in a right-to-take action. We further conclude that the landowners are entitled to a declaration that the 40-year limits violate § 32.09(6r)(a), but that the landowners have not persuaded us that the violation is a "jurisdictional defect," as that term is used in

*Warehouse II*, particularly given the availability of a remedy available in the pending condemnation-and-valuation proceedings.[20]

## II. The Landowners' Challenge to the Hazard-Tree-Rights Provision

¶69     We now turn to the second set of issues raised by the landowners— whether the hazard-tree-rights provision in ATC's jurisdictional offers violates WIS. STAT. § 182.017(7)(h).  Before addressing the parties' arguments, we provide additional information about the pertinent aspects of the proposed easements.

¶70     As noted, in the jurisdictional offers, ATC stated its intention to take an easement that would allow it to construct and maintain a high-voltage electric transmission line on each of the landowners' properties.  The jurisdictional offer for each landowner included a map that specified the length, width, and acreage of a strip of land, which we refer to as the "transmission line easement strip," within which the transmission line and all transmission facilities would be constructed and maintained.  The map depicted the boundaries of the transmission line easement strip, and further depicted the path of the transmission line as it traverses through that strip.

¶71     The text of each proposed easement expressly identified the rights that ATC intended to acquire.  Among other things, ATC would have the right to

---

[20] The *Warehouse II* decision implies that even a "technical" defect could void the condemnation-and-valuation proceedings if the defect prejudiced the landowner.  *Warehouse II*, 291 Wis. 2d 80, ¶10.  The landowners here, who would have the burden to show prejudice, have not advanced any nonconclusory argument to support a determination that they were prejudiced by the violation of WIS. STAT. § 32.09(6r).  In both the circuit court proceedings and on appeal, the landowners have merely asserted that they "are clearly prejudiced because the eminent domain statutes are to be liberally construed in favor of the landowner."  This conclusory argument does not refer to any relevant facts, and it is insufficient to create a genuine issue of fact about whether the landowners were prejudiced by the violation.

enter the transmission line easement strip for the purpose of using the rights conveyed by the easement, and to remove trees and brush in, on, and over the strip. ATC would also have certain rights to address hazard trees and tree parts on the landowner's property that are located "outside of" and "adjacent to" the transmission line easement strip. Specifically, ATC would have the right to:

> Cut down and remove such dead, dying, diseased, decayed, leaning trees or tree parts now or hereafter existing on the property of the Landowner located outside of said [transmission line easement strip] that in [ATC's] judgment, may interfere with [ATC's] full use of [that strip] for the purposes stated herein or that pose a threat to the safe and reliable operation of the Electric Transmission Facilities; together with the right, permission and authority to enter in a reasonable manner upon the property of the Landowner adjacent to said [strip] for such purpose.

The proposed easements do not describe the length, width, or acreage of the area "outside of" and "adjacent to said [transmission line easement strip]" within which ATC would be permitted to exercise hazard-tree rights, nor do the maps designate any specific area within which ATC would be permitted to exercise those rights.

¶72 According to ATC, it is required by law "to protect electric lines from hazard trees," and the hazard-tree-rights provision is necessary "to a safe transmission system." The landowners do not challenge the necessity of the hazard-tree-rights provision. They instead challenge the provision on the ground that, they argue, the provision violates WIS. STAT. § 182.017(7)(h).

¶73 WISCONSIN STAT. § 182.017(7)(h) is part of a more comprehensive statutory section, § 182.017, that specifically governs transmission lines. Subsection (7) sets forth a list of "conditions and limitations" that apply to "easement[s] for rights-of-way for high-voltage transmission lines." Those conditions and limitations pertain, among other things, to the form of easement

37

conveyances, the construction and maintenance of transmission lines, the use of herbicides, the ownership and harvesting of trees within the easement boundaries, and, as relevant here, the "use" of "any lands beyond the boundaries of the easements." *See* § 182.017(7)(h). Subsection 182.017(7) provides, in part:

> (7) Any easement for rights-of-way for high-voltage transmission lines as defined under [WIS. STAT.] s. 196.491(1)(f) shall be subject to all of the following conditions and limitations:

> (a) The conveyance … shall describe the interest transferred by specifying, in addition to the length and width of the right-of-way, [certain specifications about the transmission poles, the transmission lines, and the maximum voltage the lines will transmit].

> ….

> (e) The landowner shall be afforded a reasonable time prior to commencement of construction to harvest any trees located within the easement boundaries, and if the landowner fails to do so, the landowner shall nevertheless retain title to all tress cut by the utility.

> ….

> (h) The utility may not *use any lands beyond the boundaries of the easement* for any purpose, including ingress to and egress from the right-of-way, without the written consent of the landowner.

> (i) The rights conferred under paras. (c) to (h) may be specifically waived by the landowner in an easement conveyance which contains such paragraphs verbatim.

(Emphasis added.)

¶74 Our focus is on WIS. STAT. § 182.017(7)(h), which prohibits a utility from "us[ing] any lands beyond the boundaries of the easement for any purpose." Here, the hazard-tree-rights provision in the easements expressly and unambiguously allows ATC to use lands that are *beyond the boundaries of the transmission line easement strip*, which constitutes the right-of-way for the

38

transmission line. Thus, whether the provision violates § 182.017(7)(h) turns on the meaning of the phrase "boundaries of the easement," and whether those boundaries are one and the same as the boundaries of the transmission line easement strip. If the boundaries of the easement and the boundaries of the transmission line easement strip are the same, it would necessarily follow that the land outside of and adjacent to the transmission line easement strip on which ATC intends to exercise hazard-tree rights is "beyond the boundaries of the easement."

¶75 The parties dispute this key point. ATC argues that the easement is broader than the transmission line easement strip, and that the boundaries of the easement are not limited to the boundaries of the transmission line easement strip. According to ATC, an easement's boundaries are circumscribed by the rights that the easement itself grants, and here, those boundaries encompass all lands over which the easement grants ATC rights, including the land outside of and adjacent to the transmission line easement strip on which it may exercise hazard-tree rights.

¶76 To conclude that the hazard-tree-rights provision violates WIS. STAT. § 182.017(7)(h), we must reject this argument by ATC, and we must instead conclude that the "boundaries of the easement" and the boundaries of the transmission line easement strip are one and the same. The landowners advance several related arguments in support of that premise, all of which center around the idea that a high-voltage transmission line easement must have precise boundaries that can be drawn on a map. Applying these concepts here, the landowners point out that the only boundaries depicted in the easement maps are those of the transmission line easement strip; therefore, they contend, the boundaries of the easement must be the boundaries of the transmission line easement strip. If ATC wanted to take the right to cut down hazard trees beyond the transmission line

easement strip, the landowners argue, ATC should have drawn a transmission line easement strip with wider boundaries.

¶77    As we now explain, the landowners' argument rests on unsupportable premises. We begin with the landowners' assertion that the term "easement" in WIS. STAT. § 182.017(7)(h) means a right to use a "defined strip of land." Based on this assertion, the landowners interpret the statute's use of the phrase "boundaries of the easement" to refer to a strip of land, the physical edges of which can be defined by length and width and delineated by lines that are drawn on a map. Yet, the landowners do not cite any authority to support the assertion that "easement" necessarily means a right to use a "defined strip of land," and the legal sources we have consulted do not support such a limited definition.

¶78    "Easement" is a legal term that is not specifically defined in WIS. STAT. ch. 182. However, there are Wisconsin cases that define the term, and those definitions do not support the argument that an easement must necessarily be a defined strip of land that can be drawn on a map. The language used in the case law varies, but the consistent theme that emerges from these cases is that an easement is a *right or privilege* to use land belonging to another, often *for a specific purpose*. In *Garza v. American Transmission Co.*, 2017 WI 35, ¶ 23, 374 Wis. 2d 555, 893 N.W.2d 1, for example, the court defined "easement" as follows:

> An easement grants a right to use another's land.... The dominant estate holder's use of the easement must be in accordance with and confined to the terms and purposes of the grant. Any use not in accordance with the specific right to use granted in the easement is outside the easement's scope and thus prohibited.

40

*Id.* (citations omitted); *see also **Grygiel v. Monches Fish & Game Club, Inc.**,* 2010 WI 93, ¶13, 328 Wis. 2d 436, 787 N.W.2d 6 ("An easement is a liberty, a privilege, or an advantage in lands" that is "distinct from [the] ownership [of the land].").

¶79 This definition, which focuses on the use of someone else's land for specified purposes, is consistent with how the term is defined in legal dictionaries. One such dictionary defines an "easement" as "the right to use the real property of another for a specific purpose." *Easement*, dictionary.law.com, https://dictionary.law.com/Default.aspx?selected=603 (last visited August 27, 2024); *see also Easement*, BLACK'S LAW DICTIONARY (11th ed. 2019) (providing a definition of "easement" that recognizes that easements can grant different types of rights, including but not limited to a "right-of-way" and a "right of entry for any purpose relating to the dominant estate"). Although some definitions contemplate that some easements are strips of land with definite boundaries that can be drawn on a map, they also recognize that other easements are not so confined. Indeed, one such dictionary acknowledges that easements are not always described by boundaries that can be drawn on a map, and can instead be described based on the easement's purpose:

> Easements may be specifically described by boundaries ('24 feet wide along the northern line for a distance of 180 feet'), somewhat indefinite ('along the trail to the northern boundary') or just for a purpose ('to provide access to the Jones property' or 'access to the spring') sometimes called a 'floating easement.'

*Easement*, dictionary.law.com, https://dictionary.law.com/Default.aspx?selected =603 (last visited August 27, 2024). Accordingly, we reject the landowners' assertion that an easement always means the right to use a defined strip of land.

41

¶80    We turn to the landowners' argument that WIS. STAT. § 182.017(7) itself requires high-voltage transmission line easements to have a defined length and width, with boundaries that can be depicted on a map. This argument is based on two paragraphs in § 182.017(7), para. (7)(h) and para. (7)(a).[21] We consider those paragraphs in turn, ultimately rejecting the landowners' arguments.

¶81    As stated, WIS. STAT. § 182.017(7)(h) provides that "[a] utility may not use any lands beyond the boundaries of the easement for any purpose, including ingress to and egress from the right-of-way, without the written consent of the landowner." Paragraph (7)(h) thus prohibits ATC from using lands beyond the boundaries of the easement, but it does not impose any requirements on how those boundaries must be described in a jurisdictional offer or an easement conveyance. Indeed, para. (7)(h) does not purport to circumscribe the rights that can be granted in an easement in any way—it instead restricts a utility's *use* of the easement, and the utility's use of the easement necessarily occurs after an easement has been taken.

¶82    It is WIS. STAT. § 182.017(7)(a) that expressly governs the form of the easement conveyance. As stated, it requires conveyances to specify "the length and width of the [transmission line] right-of-way," as well as other limitations on the structures that can be erected in the right-of-way. Thus, para. (7)(a) expressly requires the right-of-way for the transmission line to be circumscribed by length and width. According to the landowners, the statute uses the terms "easement" and "right-of-way" to mean the same thing, and para. (7)(a)

---

[21] The landowners do not identify any other statute that requires a utility to confine the hazard-tree rights it takes as part of an easement to a defined strip of land.

should therefore be read to require a utility to specify the length and width of the entire strip of land within which a utility can exercise all of its easement rights.

¶83 We reject this interpretation, which is based on the premise that the terms "easement" and "right-of-way" are synonyms. Here, WIS. STAT. § 182.017(7) repeatedly uses both terms, sometimes in the same sentence. Generally speaking, when the legislature uses two distinct terms in a single statute, we assume that the legislature intended those terms to mean different things. *State ex rel. DNR*, 380 Wis. 2d 354, ¶28 (citations omitted). And, as discussed above, the term easement means a right to use property for purposes that include, but are not limited to, a right-of-way. *Easement*, BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, the statutory language contemplates that an "easement for rights-of-way for high-voltage transmission lines" encompasses, but may be broader than, the "right-of-way" granted in the easement. *See* § 182.017(7) (referring to an "easement for rights-of-way"); *see also* § 182.017(7)(h) (addressing the utility's use of "lands beyond the boundaries of the easement for any purpose, including ingress to and egress from the right-of-way"). We therefore conclude that para. (a) requires a utility to specify the length and width of the transmission line right-of-way, as ATC has done in these cases, but para. (a) does not require the utility to specify the length and width of the entirety of its easement.

¶84 For these reasons, we reject the landowners' argument that the hazard-tree-rights provision grants ATC the right to remove hazard trees outside of the "boundaries of the easement," in violation of WIS. STAT. § 182.017(7)(h). As used in that statute, the "easement" encompasses all rights, including but not limited to a right-of-way, that the utility takes and pays for. Here, the easements grant ATC the right to "enter in a reasonable manner" the property adjacent to the transmission line easement strip for the purpose of cutting down and removing

trees and parts of trees "outside of" the transmission line easement strip that are "dead, dying, diseased, decayed, [or] leaning," and that might "interfere with" the use of the right-of-way or "pose a threat to" the transmission line. Therefore, because the easements grant these rights to ATC, its exercise of those rights will be within the boundaries of its easement.

¶85    The landowners argue that this interpretation renders the protections of WIS. STAT. § 182.017(7)(h) meaningless because a utility "could define the easement as any overbroad rights it writes into the document," thereby allowing it to go anywhere on the property. This argument misses the mark. The evident purpose of § 182.017(7)(h) is to prevent a utility from using any lands beyond the boundaries of the easement that it has taken. That is, the statute requires a utility to take—and to pay for—all of the rights in the land that it intends to use, and it prohibits a utility from later using any rights that it has not taken. There are statutory remedies other than § 182.017(7) that work to prevent a utility from taking "vague" and "overbroad" rights for which there is no necessity.

¶86    In sum, we conclude that the easement documents, which grant ATC the right to remove hazard trees in an area adjacent to the transmission line easement strip, do not violate WIS. STAT. § 182.017(7)(h).

### III. The Hodgsons' Challenge to the Field Roads and Lanes Provision

¶87    The Hodgsons lodge a similar challenge to one additional provision in the easement on their property. As with the other easements, the Hodgson easement included a strip of land that we have called the transmission line easement strip, through which the right-of-way for the transmission line would pass, and the hazard-tree-rights provision we have just discussed. Additionally, the Hodgson easement also identified a second defined strip of land that we refer

to as the "permanent access easement strip," and certain additional rights related to access.

¶88    More specifically, the permanent access easement strip would allow passage from the transmission line easement to an adjacent road.  ATC would have the right to "[c]onstruct any road or access way" over the permanent access easement strip, and also, "[a]s part of the access easement," to "use existing field roads and lanes for ingress and egress over and across [the Hodgsons'] property to the transmission line easement."  The language of this latter provision is potentially ambiguous because it does not expressly state that ATC can use existing field roads and lanes that are outside of the permanent access easement strip.  However, the parties appear to agree that the provision would grant ATC the right to use existing field roads and lanes on the Hodgsons' land that are not encompassed within the permanent access easement strip.

¶89    The Hodgsons argue that this provision violates WIS. STAT. § 182.017(7)(h) because it would allow ATC to use lands outside the boundaries of the easement "for ingress to and egress from the right-of-way."  *See* § 182.017(7)(h).  For the reasons set forth in the preceding section of this opinion, we disagree.  The boundaries of the transmission line easement strip and permanent access easement are not the "boundaries of the easement," as that phrase is used in § 182.017(7)(h).  Instead the "boundaries of the easement" are all of the lands over which ATC may exercise the rights the easement grants it.  Therefore, the Hodgson access-rights provision does not violate § 182.017(7)(h).

## CONCLUSION

¶90    For the foregoing reasons, the judgment is affirmed in part and reversed in part, and we remand for the circuit court to enter a revised order that is

consistent with this opinion. On remand, we direct the court to enter an order declaring that the 40-year limits in the jurisdictional offers violate WIS. STAT. § 32.09(6r) and that the hazard-tree-rights provision and the Hodgson access provision do not violate WIS. STAT. § 182.017(7)(h).

*By the Court.*—Orders affirmed in part; reversed in part and cause remanded with directions.

Recommended for publication in the official reports.